IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

SYDNEY L. McCRAY,
      Plaintiff,

vs.                                 Case No. 3:06cv371/LAC/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## <u>ORDER, REPORT AND RECOMMENDATION</u>

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act").  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

_____

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of Social Security. Therefore, he is automatically substituted as Defendant.  *See* Fed. R. Civ. P. 25(d)(1).

## I.   PROCEDURAL HISTORY

This suit involves two applications made under the Act.  On October 15, 2002, Plaintiff protectively filed his applications for DIB under Title II and SSI under Title XVI of the Act (Tr. 163–66, 351–53).[2, 3]  He alleged an onset of disability date of July 10, 2002 (Tr. 164, 188, 351). Plaintiff's applications were denied initially (Tr. 96, 99–101, 354, 356–58) and on reconsideration (Tr. 98, 104–06, 359–63).  On March 29, 2006, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 13–35).  On July 14, 2006, after considering additional evidence submitted by Plaintiff (*see* Tr. 366–89), the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 8–12).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  This appeal followed.

## II.   FINDINGS OF THE ALJ

On March 29, 2006, the ALJ made several findings relative to the issues raised in this appeal (Tr. 18, 26, 29, 32–34):

   1)   Plaintiff met the insured status requirements of the Act on July 10, 2002, the date he contends he became unable to work, and he will continue to meet them through December 31, 2007.

   2)   Plaintiff has not engaged in substantial gainful activity at any time relevant to the ALJ's decision (20 C.F.R. § 404.1520(b)).

   3)   Plaintiff has the following severe impairments: major depressive disorder with psychotic features, mood disorder secondary to general medical condition, and pain disorder associated with back pain, depression, and insomnia (20 C.F.R. § 404.1520(c)).

---

[2]In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).  Therefore, citations in this report and recommendation should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

[3]All references to "Tr." refer to the Transcript of Social Security Administration Record filed on November 7, 2006 (Doc. 5).

4)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix (20 C.F.R. § 404.1520(d)).

5)      Plaintiff has the residual functional capacity ("RFC") to perform unskilled and low semiskilled work activities over a wide range of exertional levels.

6)      Plaintiff is unable to perform any of his past relevant work  (20 C.F.R. § 404.1565).

7)      Plaintiff was born on August 27, 1970, and was 31 years of age on the alleged disability onset date (thus, he is defined as a "younger individual," aged 18–44 (20 C.F.R. § 404.1563)).

8)      Plaintiff has a "high school and above" level of education (20 C.F.R. § 404.1564).

9)      Transferability of job skills is not material to the determination of disability due to Plaintiff's age (20 C.F.R. § 404.1568).

10)     Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 C.F.R. § 404.1560(c)).

11)     Plaintiff has not been under a "disability," as defined in the Act, from July 10, 2002, through March 29, 2006, the date of the ALJ's decision (20 C.F.R. § 404.1520(g)).

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by

substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote</u>
<u>v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but
not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate
to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.
2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L.
Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the
evidence, or substitute its judgment for that of the Commissioner.  <u>Martin v. Sullivan</u>, 894 F.2d
1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the
Commissioner's decision, the decision must be affirmed if supported by substantial evidence.
<u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

   The Act defines a disability as an "inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental impairment which can be expected to result
in death or which has lasted or can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment
must be so severe that the claimant is not only unable to do his previous work, "but cannot,
considering his age, education, and work experience, engage in any other kind of substantial gainful
work which exists in the national economy."  <u>Id</u>. § 423(d)(2)(A).

   Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in
five steps:

   1.      If the claimant is performing substantial gainful activity, he is not disabled.

   2.      If the claimant is not performing substantial gainful activity, his impairments must
be severe before he can be found disabled.

   3.      If the claimant is not performing substantial gainful activity and he has severe
impairments that have lasted or are expected to last for a continuous period of at least twelve
months, and if his impairments meet or medically equal the criteria of any impairment listed in 20
C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

   4.      If the claimant's impairments do not prevent him from doing his past relevant work,
he is not disabled.

5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.    Personal History

On October 25, 2002, Plaintiff completed a disability report (Tr. 187–96).  In the report Plaintiff indicated that he is disabled due to major lower back pain and is unable to "bend and walk when need[ed]" (Tr. 188).  Plaintiff noted that he resigned from his prior employment because his "back began to hurt more regularly than ever" (id.).  Previously, Plaintiff was employed as a food services clerk, an Army munitions specialist, a forklift operator, a truck driver, and a mechanic (Tr. 189; see Tr. 197–204 (a second work history report)).  Plaintiff indicated that in his last job as a mechanic he walked four hours a day; stood three hours a day; sat one hour a day; and knelt, crouched, and handled/grabbed a half an hour a day (Tr. 189).  Plaintiff wrote that he frequently lifted and carried truck batteries approximately thirty feet (id.).  The most he ever lifted was fifty pounds, but he frequently lifted twenty-five pounds (id.).  He had seen several doctors and was taking Ibuprofen (see Tr. 190–91).  He also indicated that he was not receiving and did not want to receive vocational rehabilitation (Tr. 194).

The record also contains an untilted disability report completed by Plaintiff on October 31, 2002 (Tr. 205–07).  Plaintiff indicated that his middle and lower back, spine, buttocks, and left leg have an "up and down burning feeling" (Tr. 205).  Bending, standing, walking, sitting, and reaching "hurt" and are "difficult" (id.).  "Cold weather makes everything more difficult" (id.).  Plaintiff claims that movement has become more difficult in the past six months and that "now [he is] starting

to use a walking stick to help move around" (*id.*). Plaintiff also indicated that he was only taking Motrin 800 mg and that the medication was not effective (Tr. 205–06). The only side-effect Plaintiff noted was "gas" (Tr. 206). Plaintiff indicated that his pain prevents him from cooking/meal preparation (lifting and reaching pots and pans), personal care (dressing, bending, and kneeling), house cleaning (mopping, sweeping, and vacuuming), laundry (loading clothes), sleeping ("hard to roll over, hurts to lay flat[,] [and] on my side"), driving (sitting hurts, getting in and out of the car hurts), yard work/gardening (bending, standing, and lifting), social activities ("mental[ly] I get upset because my movement is limited [and it is] hard to get along with [people]"), child care (Plaintiff indicated that he has problems getting along with others), and home maintenance (Plaintiff again indicated that he has problems getting along with others) (Tr. 206–07). Plaintiff did not indicate any pain associated with shopping (Tr. 206). Plaintiff also wrote that his "ability to work with comfort and ease" was limited due to "pain . . . in [his] back and left leg[] . . ." and he was not able to do "a lot of things" that he "know[s] [he] should be able to do" (Tr. 207). Finally, Plaintiff wrote "I do not want anyone to lose money, production or service due to my pain" (*id.*).

On March 11, 2003, in a reconsideration disability report, Plaintiff indicated that he had "more stiffness, less sleep, [more] pain [and] stress" (Tr. 208). Standing, sitting, and lifting increased Plaintiff's pain (*see id.*). Plaintiff alleged that he was now using a cane, analgesia cream, Cyclobenzaprine, Hydrocodone 2.5, and Ibuprofen 800 mg (Tr. 209). Regarding daily activities, Plaintiff explained that he is not "able to be active with [his] sons, [and do] simple task[s] such as running, riding, and yard work" (Tr. 210).

On April 2, 2003, Plaintiff filed another disability report, indicating that he could not cook his own meals, go shopping, do household chores, manage his finances, or attend to his own personal care (Tr. 214–15). Regarding his income, Plaintiff explicitly stated that he had "no income" (Tr. 215). Plaintiff also indicated that he was unable to function socially or go out with friends due to "restricted movement because of back pain" (Tr. 216). Plaintiff indicated, however, that he could "get along well with people in authority" (e.g., bosses) and the public (e.g., bus drivers, store clerks) (*id.*). Plaintiff further indicated that he could remember the past accurately, but he could not concentrate on what he was doing "because of back pain" (Tr. 216–17). Plaintiff noted that he could follow spoken and written instructions (Tr. 217). With regard to his symptoms,

Plaintiff wrote that he had chronic lower back pain and left leg warmness, tingling, and burning that is exacerbated by cold temperatures (Tr. 218). Plaintiff said that his pain often lasted for thirty minutes to an hour "with medication" (*id.*). He explained that he was taking Hydrocodone 7.5, Motrin 800 mg, and an antidepressant "as needed" (*id.*). He claimed that the pain medications work from thirty to forty-five minutes, but then the pain comes back (Tr. 219). The medications make him dizzy, nauseous, and sweaty (*id.*). Other than medication, Plaintiff stated that he was only receiving physical therapy to treat his condition (*id.*). Finally, Plaintiff stated again that his back pain "keeps [him] from performing any work duties" (Tr. 220).

Additionally, Plaintiff testified at two hearings before the ALJ (*see* Tr. 36–68, 69–92). The first hearing was held on January 25, 2005 (*see* Tr. 36–68). A supplemental hearing was held on October 8, 2005 (*see* Tr. 69–92).

On January 25, 2005, Plaintiff testified as follows (*see* Tr. 36).[4] He was born on August 27, 1970, was thirty-one years old at the time of the hearing, was about six-feet seven-inches tall, and weighed about 280 pounds (Tr. 40). Plaintiff completed high school and attended college for two years, receiving an associate's degree in criminal justice (Tr. 41). Plaintiff never used his degree for employment purposes (*id.*). After school, Plaintiff joined the Army and received special training as a munitions specialist (*see* Tr. 41–42). After leaving the Army, he worked as a heavy diesel mechanic for six to seven years until July 10, 2002 (Tr. 45; *see also* Tr. 164 (indicating July 10, 2002 as the date of alleged onset)). He testified that his job duties included standing, bending, and lifting from 75 to 120 pounds (Tr. 45). Plaintiff testified that he quit his job as a mechanic in July 2002 because he "didn't want to get fired" and his "back problem just got worse and worse to where [he] couldn't stand the pain or anything" (*id.*). He also testified that he did not file for unemployment or worker's compensation benefits, and his veterans affairs benefits were "on hold right now" (*id.*). Plaintiff testified that he applied for military benefits but was denied (Tr. 57). He also explained that he does not think he can do lighter work because "Sitting long periods of time

---

[4]The record indicates that Plaintiff failed to appear for a hearing before the ALJ scheduled for October 28, 2004 (*see* Tr. 124–25, 138). Apparently, Plaintiff moved and the notice of hearing was sent to the wrong address (Tr. 144). The record indicates that the hearing was rescheduled for January 25, 2005 (*see* Tr. 145).

and I have been dealing with it for years working . . . [but] [t]his is actually the first time I have been out of work and just — I don't know — being uncomfortable a lot and just sitting and moving around or either walking." (Tr. 49).  Plaintiff also testified that his severe pain affects his ability to concentrate for long periods (*id.*).

Plaintiff testified that he did not receive any income after July 2002 (Tr. 59).  He stated that he supports himself by watching his sisters' children who are seven, eight, ten, and eleven (*id.*).  Plaintiff explained that his sisters pay for his room and board and give him spending money (*id.*).

Plaintiff has seen several physicians due to his injuries and continues to be seen regularly by the Department of Veterans Affairs ("VA") (Tr. 46).  At the time of the hearing, Plaintiff ranked his pain as seven to nine on a ten-point scale (*see id.*).  He testified that he takes Lortab for pain but that it has created additional problems with his liver (Tr. 47).  Plaintiff also testified that he is receiving treatment from VA doctors for psychological, emotional, and mental problems associated with his alleged disability (Tr. 48).  "Down at the mental health at VA we kind of play around with like mental health counseling and groups and stuff.  So it may be like [one doctor] today and somebody else, you know, next time, like that." (*id.*).  Plaintiff testified that he has been shuffled around from one mental health therapist to another (Tr. 49).  Other than treatment from the VA, Plaintiff testified that he is not seeking treatment for his mental conditions (Tr. 60).  He stated that the VA has not placed limits on what he can do mentally or physically (*id.*).  He also testified that he previously never had trouble getting along with co-workers or following instructions, but at present, however, he thought he would have trouble getting along with co-workers because "my pain in my back and all and just, like I said, probably my physical appearance" makes it so that "a lot of people don't believe me that . . . I'm hurting and all at different times" (Tr. 60–61).

Upon questioning by the ALJ, Plaintiff testified that he had been diagnosed with a herniated and arthritic disc in 2000 (*see* Tr. 52).  Plaintiff admitted that a radiological report confirming this diagnosis was not in the record, but he stated that several doctors referred to the report (*see id.*).  No doctor has recommended that Plaintiff have surgery (*id.*).  Plaintiff testified that he only takes Lortab for pain and that he often breaks the pills in half (*see* Tr. 52–53).  He also testified that he only takes Lortab a few times a week, depending on the weather (Tr. 53).  The ALJ asked Plaintiff if he told a VA psychiatrist that he had not worked since 1996, and Plaintiff denied making such a statement

(*id.*).  The ALJ also asked Plaintiff if he told a VA psychiatrist that he was limited to lifting fifteen to twenty pounds, but Plaintiff responded by stating that he did not "know anything about that [INAUDIBLE]" (*id.*).  Plaintiff then explained that he stated he was limited to lifting fifteen to twenty pounds because "different doctors" had told him that he was limited (Tr. 54).  The ALJ asked if these limitations were in the record, and Plaintiff testified that they were not (*id.*).  Plaintiff also testified that he told the VA psychiatrist that he could only sit or stand for ten to fifteen minutes and walk a half of a block; Plaintiff also said that this information was not contained in the record (*id.*).  Plaintiff testified that he has had hallucinations (*id.*).  In particular, Plaintiff testified that his last hallucination was in December 2003, and it was because he "couldn't provide [his] kids [with] anything" for Christmas (*see* Tr. 54–55).  He noted that other hallucinations were about people not believing he was disabled (Tr. 55).  He has also had suicidal thoughts (*id.*).

Regarding Plaintiff's personal life, he is divorced and has two children (*see* Tr. 44, 57).  He has been living with his six sisters (Tr. 43).  He moves from house to house (*see id.*).  Plaintiff supports his fourteen-year-old child by paying child support to his ex-wife (Tr. 44, 57–58).  At the time of the January 25, 2005 hearing, Plaintiff testified that the support payments were "on hold" (Tr. 44, 58 (Plaintiff testified that he is about $7,000.00 behind on his child support)).  Plaintiff also testified that he has a nineteen-month-old baby from another relationship, and he cares for this child daily  (Tr. 44).  He takes care of all the "childcare and washing and all that good stuff" without any support, financial or otherwise, from the infant's mother (*id.*).

Regarding his daily activities, Plaintiff testified that he still drives but has to stop and sit "for awhile, [a] long time" when parking (Tr. 42, 60 (Plaintiff testified that he drove to the January 25, 2005 hearing, but he did not mention stopping and sitting when he parked)).  Driving creates "[s]tiffness, a warm tingling sensation in [his] leg, and discomfort having to move from side to side" (Tr. 42).  Plaintiff is "sometimes" able to care for his personal needs, such as bathing and dressing (Tr. 43).  Plaintiff also testified that for a period of time he was directed by the VA to exercise each day, but now he can only walk around the block once a week (*see* Tr. 49–50).  Plaintiff testified that on a good day he can clean around the house and do chores (Tr. 50).  On a bad day, Plaintiff described himself as "[n]ot sociable, lying or sitting, lying down" about an hour and a half to two hours a day (*id.*).  When the weather is cold, Plaintiff testified that he has about four bad days out

of seven "all because of the arthritis" (Tr. 51).  When it is warmer, Plaintiff testified that he has about two bad days out of seven (*id.*).

On October 8, 2005, a supplemental hearing was held before the ALJ (*see* Tr. 69).  Plaintiff testified, in contrast to his previous testimony, that he was receiving income from the VA (Tr. 73). Plaintiff testified that he said he did not have any income during the January 25, 2005 hearing because the money that the VA was sending him was not going to him, but rather was going to his children (*id.*).[5]  Plaintiff also testified that he was still not current on his child support (Tr. 78).  He testified that he receives a VA check for $2,514.00 each month and has been receiving this money since September 2002 (Tr. 73–74).[6]  Plaintiff testified that he receives these benefits as a result of a 100 percent VA disability rating (Tr. 75).  He said that he receives no other income and has not worked since the January 25, 2005 hearing (*id.*).  Plaintiff testified that he has received medical treatment since January 25, 2005 from the VA and other doctors (*id.*).  He testified that he goes to mental health counseling twice a month (Tr. 76).  Plaintiff testified that his condition has become worse since the January 2005 hearing (Tr. 77).  He said that his leg stiffness is "prolonged [when] standing and walking" (*id.*).  He also said that his mental situation is worse, but he did not elaborate (*see id.* at 78).  Plaintiff noted that he takes Lortab 75, Hydrocodone 7.5, and 800 mg Motrin for his back pain (Tr. 80).  He also uses a TENS Unit for the tenderness in his back (*id.*).

---

[5]Plaintiff explained further that "somebody [was] intercepting" his check (Tr. 81).  Then, Plaintiff said that he knew that the check was going to a different person because he was sending it to a "relative" (*id.*).  In some cases, the relative never gave Plaintiff any of the money and "[t]hat's why I move [from] place to place" (*id.*).  He said that someone else ("a relative") cashing the check was "a whole different story" (*id.*).  Plaintiff said that he did not consider the check income because he was signing the check and sending it to "a relative" (Tr. 82).  Still, Plaintiff said that he knew the VA was sending <u>him</u> money each month (*id.*).

[6]Plaintiff also testified that the amount was $2,519.00 (Tr. 75).

B.      Relevant Medical History

In July and August 1998, Plaintiff was treated by Daniel J. Bourassa, D.C., C.C.R.D. (Tr. 234–37).  On July 23, 1998, Dr. Bourassa noted that Plaintiff presented with acute back pain as a result of lifting a sheet of metal at work (Tr. 237).  Examination revealed tenderness and spasm in the thoracolumbar spine and active dorsolumbar range of motion moderately decreased with pain (*id.*).  X-rays showed cortical margins intact and disc heights mildly decreased throughout the lumbar and thoracolumbar spine, with mild left listing of the lumbar spine above L4 (*id.*).  Dr. Bourassa prescribed chiropractic manipulation and electrical muscle stimulation therapy three to four times a week for two weeks (*id.*).  Dr. Bourassa also advised Plaintiff to do stretching exercises and use an ice pack (*id.*).  On July 24, 1998, Plaintiff presented with a segmental dysfunction in the cervical spine with palpable myotendiotic changes in soft tissues, lumbar pain on palpation, and stiffness (Tr. 235).  Dr. Bourassa treated Plaintiff with electrical muscle stimulation therapy and noted 20 to 30 percent improvement (*id.*).  On July 27, 1998, Plaintiff returned and was again treated with electrical muscle stimulation therapy (*id.*).  Plaintiff was advised to exercise as instructed and was given a cold pack (*id.*).  The physician's notes indicate "relief post" treatment (*id.*).  On July 28, 1998, Plaintiff returned with the same symptoms and was treated (*id.*).  The notes indicate dramatic improvement since treatment began (Tr. 236).  On July 30, 1998, Plaintiff presented with similar symptoms and was treated with electrical muscle stimulation therapy (*id.*).  The notes indicate that Plaintiff again experienced relief post treatment and was improving "as expected" (*id.*).  On August 17, 1998, Plaintiff returned for follow-up and an additional round of electrical muscle stimulation therapy (Tr. 234).  A report indicates that Plaintiff was released the same day with maximum medical improvement, 0 percent impairment, and no residual disability (*id.*).

On August 22, 2002, just over a month after the alleged onset of Plaintiff's disability and four years after he had seen Dr. Bourassa, Plaintiff presented to William B. Waters, D.C., C.C.S.P., with complaints of middle and low back pain and stiffness, as well as left hip and leg pain, aggravated by bending and standing for prolonged periods (Tr. 243–45).  The treatment notes indicate that Plaintiff was treated with chiropractic manipulation and electrical muscle stimulation on five occasions through September 27, 2002 (Tr. 239–42).  On August 28, 2002, Dr. Waters's notes indicate that Plaintiff was responding slowly to the treatment, but his symptoms were better

(*see* Tr. 241).  On Plaintiff's last visit, Dr. Water's did not indicate Plaintiff's progress, but he noted that Plaintiff reported a "flare up" in his symptoms (Tr. 239).

On August 26, 2002, Plaintiff was treated at the VA outpatient clinic for severe pain in the mid-back radiating down his left leg (Tr. 266–67).  Plaintiff reported that his pain had been occurring "off and on" for about three years (*id.*).  Physical examination revealed tenderness over Plaintiff's mid-thoracic to lumbar spine, a positive bilateral straight leg raise test, and normal reflexes and muscle strength with no sensory or motor deficits (*id.*).  Plaintiff was diagnosed by a nurse practitioner ("NP") with low back pain and prescribed a muscle relaxer and non-steroidal anti-inflammatory medication (*id.*).

On January 9, 2003, Plaintiff returned to the VA outpatient clinic  for treatment of severe low back and left knee pain (Tr. 262–65).  Plaintiff also reported that his left knee would go out on him and cause him to lose his balance (Tr. 262).  Plaintiff was examined by an NP who noted that Plaintiff walked with a stiff gait and had paravertebral tenderness at T10-L5 (Tr. 264).  Plaintiff was diagnosed with chronic back pain and prescribed Lortab, in addition to the other medications prescribed five months earlier, and he was given a consult for a cane (*id.*).  Plaintiff remarked that his pain ranged from seven to nine on a ten-point scale, and he rated it at nine during his visit (*id.*).  A mood/depression screen was positive at the time of the January 2003 visit, and Plaintiff reported that he felt depressed because of decreased activity due to his low back pain (*id.*).  Plaintiff was also prescribed an antidepressant medication (*id.*).

On April 23, 2003, Plaintiff was seen for follow-up at the VA outpatient clinic (Tr. 260–61).  Plaintiff was examined by Ronald C. McPhail, M.D. (*id.*).  Dr. McPhail noted Plaintiff's complaints of chronic low back pain and indicated that a lumbar spine x-ray from January 2003 was normal (Tr. 260).  Plaintiff rated his pain as an eight on a ten-point scale (Tr. 261).  Plaintiff was given medication refills and instructed to return for a follow-up (*id.*).

On May 9, 2003, Plaintiff returned for a follow-up and saw Rommel B. Singh, M.D. (Tr. 258–59).  Plaintiff reported his pain level as an eight out of ten (Tr. 258).  Dr. Singh noted that Plaintiff's chronic back pain was controlled, and he continued Plaintiff on all medications, including the antidepressant (*id.*).

Plaintiff underwent liver function testing at the VA clinic in September 2003 and November 2003 (Tr. 341).  The results showed some evidence of decreased liver functioning (*id.*).  These findings were documented by Mary Surrett, an NP at the VA mental health clinic (*id.*).

On January 14, 2004,  Plaintiff presented to NP Surrett for a mental evaluation (Tr. 340–41).  Plaintiff was very anxious and nervous because an evaluation by an unnamed doctor in Biloxi, Mississippi revealed that "his liver was failing" (Tr. 340).  Plaintiff advised NP Surrett that he was not depressed and was sleeping better (*id.*).  Plaintiff also advised NP Surrett that he felt he was doing much better and did not want to come to the mental health clinic anymore (*id.*).  She observed that Plaintiff's speech and thoughts were clear and logical, his mood was upbeat, and he smiled during the conversation (*id.*).  At the conclusion of the twenty-five minute evaluation, NP Surrett assessed a Global Assessment of Functioning ("GAF") score of 60 (Tr. 341).[7]  She also continued Plaintiff  on Pamelor (*id.*).

On February 26, 2004, Plaintiff presented to the VA with complaints of back pain (Tr. 339–40).  It was noted that Plaintiff had not yet received his TENS unit, and further, that Plaintiff should be seen in follow-up after he was using a TENS unit (Tr. 340).

On March 1, 2004, Plaintiff was examined by Clay L. Molstad, M.D., at the VA outpatient clinic (Tr. 336–39).  Dr. Molstad recorded no specific complaints of pain by Plaintiff, and Plaintiff reported his pain level as a five out of ten (Tr. 336–37).  Plaintiff said that his tolerable level of pain was a two out of ten (Tr. 337).  Dr. Molstad's examination of Plaintiff revealed no abnormal findings, and he diagnosed Plaintiff with hypertension, depression, mood disorder due to a general medical condition, and chronic back pain (*id.*).  Plaintiff was taking the following medications: Cyclobenzaprine HCL 10 mg, Felodipine 10 mg, Triamterene 75 mg, methyl salicylate 10 percent cream, and Nortriptyline HCL 25 mg (Tr. 338).

---

[7]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 51 and 60 reflects moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *Id.*

On April 27, 2004, Plaintiff returned to Dr. Molstad (Tr. 332–36).  At the time, Plaintiff was taking Triamterene 75 mg and Nortriptyline HCL 25 mg (Tr. 332).  Plaintiff reported his level of pain as an eight out of ten at the present time, with a range of seven to ten at other times (Tr. 335).  A screening for post traumatic stress disorder was negative (Tr. 336).

On June 4, 2004, Plaintiff returned to the VA clinic and was treated by Linda J. Lancaster, M.D., a psychiatrist (Tr. 331–32).  Dr. Lancaster noted that Plaintiff was bereaved about the loss of his brother due to a sudden medical condition about three weeks earlier (Tr. 331).  Dr. Lancaster discussed death and dying with Plaintiff (*id.*).  Plaintiff advised that he was taking Pamelor but was unable to sleep (*id.*).  Dr. Lancaster suggested using Ambien temporarily (*id.*).  Dr. Lancaster also suggested that Plaintiff attend groups and therapy, but Plaintiff declined treatment (*id.*).  Dr. Lancaster observed that Plaintiff was neatly groomed, his mood was dysphoric, and his thought was generally directed and logical (*id.*).  She noted no psychotic features (*id.*).  Dr. Lancaster prescribed Ambien 10 mg to help Plaintiff sleep (Tr. 332).

On July 21, 2004, Plaintiff returned to the VA outpatient clinic for follow-up (Tr. 327–31).  Plaintiff was continued on his medications (*see* Tr. 328, 330).  He reported his pain as an eight out of ten (Tr. 330).  A note from a week earlier, July 14, 2004, indicates that Plaintiff was still waiting on the TENS unit (Tr. 331).

On August 11, 2004, Plaintiff phoned the VA outpatient clinic (Tr. 326–27).  A mental assessment was completed (Tr. 326).  Plaintiff stated that the Nortriptyline and Zolopidem medications were not effective (*id.*).  Plaintiff also reported that he had been having sexual dysfunction since starting on the antidepressants (*id.*).  Plaintiff stated that he was living with his sisters but sometimes stayed with friends from time to time (*id.*).  Plaintiff reported feeling little interest or pleasure; feeling down, depressed, or hopeless; and having trouble falling or staying asleep nearly every day (Tr. 326).  He reported feeling tired or having little energy, poor appetite, feeling bad about himself, having trouble concentrating, and moving and speaking slowly more than half of the days (Tr. 327).  He reported never feeling like he wished he was dead or wanted to hurt himself (*id.*).

On September 9, 2004, Plaintiff presented to Irvine Brock III, at the VA mental health clinic (Tr. 325).  Plaintiff reported some improvement in his mood but stated that he rates his mood as a

three out of ten (*id.*).  Plaintiff was distressed about his recent family losses and concerned because his family members do not believe his complaints of pain (*id.*).  His most prominent symptom was insomnia and he reported that the Ambien helped, but he was only given a ten-day supply (*id.*).  After a twenty-minute consultation, Plaintiff was diagnosed with "Major Depression r/o uncomplicated bereavement" (*id.*).  Plaintiff was given a trial of Trazedone for sleep augmentation and asked to return for follow-up in three weeks (*id.*).

The record also contains an MRI from April 7, 2006 (Tr. 371–72).  The MRI shows an interval change in the known disc protrusion/extrusion complex at L5-S1 (Tr. 372).  The Appeals Council noted that this record was submitted to it but explained that the MRI occurred after the ALJ's decision in this case (Tr. 9).  Therefore, the Appeals Council did not consider this evidence (*see id.*).[8]

C.      Other Information Within Plaintiff's Claim File

In 2003, Plaintiff underwent two consultative physical examinations by Richard W. Lucey, M.D. (Tr. 246–48, 268–71).  On January 24, 2003, Plaintiff complained of low back pain that radiated from his mid-lumbar region into his tail bone and left lower extremity (Tr. 246).  Dr. Lucey documented no abnormal findings on physical examination and noted that, although Plaintiff presented with a cane, he was tested without it and the cane was not necessary for ambulation (Tr. 247).  Dr. Lucey noted that Plaintiff's posture was erect, his gait was normal, he could walk without evidence of weakness or ataxia, and he transferred easily from sitting to standing (*id.*).  Regarding his range of motion, Dr. Lucey noted normal range of motion in his right and left shoulder, elbow, wrists, hip, knee, and ankle (Tr. 248).  Plaintiff's range of motion was limited in his cervical and lumbar spine, but Dr. Lucey noted that it was essentially normal with only a few degrees of variation (*see id.* (for example, Plaintiff's right and left extension in his lumbar spine was limited to twelve of twenty-five degrees, and his lateral flexion was limited to sixteen of twenty-five degrees, but his other limitations were within about 10 percent of normal)).  Dr. Lucey diagnosed Plaintiff with history of chronic myofascial low back pain with history of sciatica, in remission (Tr. 247).  Dr. Lucey also examined Plaintiff on May 30, 2003, at which time Plaintiff continued to complain of

---

[8]Plaintiff has raised no issue concerning the Appeals Council's consideration of the April 2006 MRI.

chronic low back pain radiating into the left lower extremity, and now also complained of depression with symptoms of feeling sad, sleep disturbances, and social withdrawal (Tr. 268). Dr. Lucey noted that Plaintiff's physical examination in May 2003 was essentially normal, except for significantly diminished range of movement in the thoracolumbar spine with associated subjective discomfort (Tr. 270). Specifically, Plaintiff's range of motion in his lumbar spine was now rated as forty-nine out of ninety degrees in forward flexion on the right and left, nine out of twenty-five degrees in extension on the left, and eight and ten out of twenty-five degrees in lateral flexion on the right and left respectively (Tr. 269). Dr. Lucey diagnosed Plaintiff with chronic low back syndrome with sciatica and reactive depression secondary to low back pain (Tr. 270). Dr. Lucey commented that Plaintiff does appear to have significant back pain and recommended an MRI (Tr. 271). Finally, Dr. Lucey remarked that Plaintiff could most likely benefit from a nerve blockade (*id.*).

On June 14, 2003, a physician completed a Physical RFC Assessment (Tr. 249–56). The physician opined that Plaintiff was able to frequently lift or carry ten pounds and occasionally lift or carry twenty pounds (Tr. 250). He could stand, walk, or sit six hours in an eight-hour workday (*id.*). His ability to push or pull was unlimited (*id.*). No postural, manipulative, visual, communicative, or environmental limitations were noted (Tr. 251–53). The physician noted that Plaintiff complained of low back pain but explained that he determined that Plaintiff had 5/5 grip strength and full range of motion in all joints and no weakness/atrophy/sensory defects or joint deformities (Tr. 251). The physician also noted that Plaintiff could walk without difficulty and transfers easily from sitting to standing (*id.*). The physician noted a somewhat limited range of motion in the thoracic spine due to complaints of low back pain (*see id.*). Plaintiff's RFC was reduced secondary to pain (*id.*). Finally, the physician remarked that "claimant's signs and symptoms are not consistent or attributable to a medical impairment" (*id.*).

Edward Holifield, M.D., completed a Physical RFC Assessment on June 16, 2003 (Tr. 272–79). According to Dr. Holifield, Plaintiff was able to lift or carry twenty pounds occasionally and ten pounds frequently, and he could sit, stand, or walk six hours in an eight-hour workday (Tr. 273). His ability to push or pull was unlimited, and no postural, manipulative, visual, environmental, or communicative limitations were established (Tr. 273–76).

On June 24, 2003, Plaintiff presented to Mitch Cooper, Ph.D., for a psychological evaluation (Tr. 280–84). Dr. Cooper noted that Plaintiff drove himself and arrived promptly for his scheduled appointment (Tr. 280). Plaintiff's posture was consistent with chronic back pain, and his movements were slow and somewhat laborious (*id.*). Dr. Cooper reported that Plaintiff was "very frustrated and depressed by his current [back problems]. He prides himself on always having provided well for his children and feels really badly now that he is unable to do so" (Tr. 282). On mental status examination, Dr. Cooper reported that Plaintiff was alert and oriented as to time, place, and person, that his recent and remote memory were intact, and that he expressed himself in a logical and goal-directed manner with no indication of delusional material, bizarre content, or other psychotic process (Tr. 283). Plaintiff denied any history of visual or auditory hallucinations, his mood was depressed, and his affect was anxious (*id.*). Plaintiff reported that he was taking an antidepressant medication but that he had never seen a mental health therapist and that he experienced fluctuations in appetite, some suicidal thoughts around the holidays (although he denied any specific plan or intent), and insomnia on a nightly basis resulting in fatigue (*id.*). Dr. Cooper reported that Plaintiff had never been a client of vocational rehabilitation and suggested that Plaintiff investigate this possibility (*id.*). Dr. Cooper also noted that Plaintiff has the "capacity for insight and judgment for daily living . . ." (*id.*). Dr. Cooper diagnosed Plaintiff with major depressive disorder, recurrent, and indicated that Plaintiff's depression might be improved with treatment (*id.*). Specifically, Dr. Cooper noted that Plaintiff "could [possibly] benefit from Vocational Rehabilitation assistance" (*id.*).

On July 18, 2003, a Psychiatric Review Technique form was completed (Tr. 285–98). The physician reported that Plaintiff's medical dispositions were not severe and reported a coexisting nonmental impairment that requires referral to another medical specialty (Tr. 285). The physician reported that Plaintiff had an affective disorder that does not precisely satisfy any of the more specific criteria for affective disorders (e.g., mood disorders including symptoms like hyperactivity, flight of ideas, or easy distractibility) (Tr. 285, 288). With regard to his functional limitations, the physician indicated that Plaintiff would experience no restriction in activities of daily living or maintaining social functioning, and had no episodes of decompensation of an extended duration (Tr. 295). The physician indicated a mild degree of limitation in maintaining concentration, persistence,

or pace (*id.*).  The doctor opined that Plaintiff's affective disorder did not meet the requirements of any Listing (Tr. 296).

The record contains a VA decision, dated October 22, 2003, which assigns a 100 percent disability rating to Plaintiff due to a "mood disorder" and which increased Plaintiff's disc disease disability rating from 10 percent to 40 percent on the basis of "lumbosacral spine degenerative disc disease" (Tr. 228–32).  The VA based its disc disease decision on a VA spine exam dated September 25, 2003 (no record of this examination is in the file — it is only referenced in the decision of the VA), which indicated that Plaintiff complained of severe back pain occurring about three times a week (Tr. 229).  The September 2003 examination notes also, as described in the VA decision, indicate that Plaintiff had pain and weakness extending through his left leg and pain associated with walking and sitting (*id.*).  According to the VA decision, the objective evidence showed some tenderness in the upper lumbar spine, positive right straight leg raise at forty degrees, slightly restricted lumbar spine range of motion, normal gait and posture, 5/5 muscle strength bilaterally in the lower extremities, and inconclusive neurological testing (*id.*).  An MRI purportedly identified a disc protrusion at L5-S1 with right nerve compression (*id.*).  The examining doctor noted that Plaintiff would experience increased pain, lack of coordination, and weakness and fatigue with repetitive use, but he could not "feasibly provide an objective measurement of that increase" (*id.*).  The VA decision noted Plaintiff's restricted movement, weakness, fatigue, lack of coordination, and pain on movement, and assigned a disability rating of 40 percent but did not assign a higher rating of 60 percent because there was no "evidence of incapacitating episodes having a total duration of at least six weeks during the past [twelve] months" (Tr. 230).  The VA decision regarding Plaintiff's mood disorder was based on a "VA mental disorder exam dated September 22, 2003," which diagnosed Plaintiff with mood disorder secondary to degenerative disc disease and assigned a GAF score of 35 (*id.*).[9]  The VA decision assigned a 100 percent disability rating based on Plaintiff's GAF (*id.*).  Again, the report of this VA examination is not in the record — it is merely referenced in the

_____

[9]A GAF score between 31 and 40 reflects some impairments in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See* Am. Psychiatric Ass'n, *supra*, note 8, at 32.

decision of the VA.  Finally, the VA decision found Plaintiff competent to handle any funds the VA may disburse to him (Tr. 231).

On June 15, 2004, Plaintiff was examined by Martha Sarasua, M.D., Ph.D., a psychiatrist (Tr. 300–05).  Plaintiff reported experiencing feelings of worthlessness and helplessness for not being able to provide for his family, and he indicated that his depression had recently worsened due to the death of his brother (Tr. 301).  Dr. Sarasua noted that Plaintiff reported a history of auditory hallucinations, with command hallucinations telling him to kill himself, and that he had suicidal thoughts in the past with no current suicidal ideation (*id.*).  Plaintiff also reported having experienced visual hallucinations in which he saw figures of people (Tr. 301).  He indicated that he had a fear of being around people, anxiety and panic attacks when in a crowd, and memory problems (*id.*).  Dr. Sarasua noted Plaintiff's treatment at the VA where "he sees a psychiatrist and nurse practitioner in mental health, [and] where he is treated for depression" (Tr. 300–01).  However, Dr. Sarasua noted that the "records from the VA Medical Clinic are not available" (Tr. 301).  On mental status examination, Dr. Sarasua noted that Plaintiff was appropriately dressed and groomed and that he was friendly and cooperative, although his mood was that of moderate depression (Tr. 301–02).  There was no overt evidence of hallucinations or delusions and no suicidal or homicidal ideation was noted (*id.*).  Plaintiff was alert and oriented to person, place, time, and situation; he could recall three objects immediately and at five minutes; he could do serial sevens to 93 correctly; he was able to spell the word "world" backward; and he could repeat five numbers forward and four numbers backward correctly (*id.*).  Proverb interpretation showed good abstraction, he was able to understand similarities, and he could follow a three-stage command (Tr. 302).  Dr. Sarasua further noted that Plaintiff was able to bathe and dress himself and able to drive, but he had a hard time being in crowds because of panic attacks (*id.*).  She indicated that Plaintiff had memory and concentration problems and that there were some mild cognitive deficits evident in the mental status examination (*id.*).  She diagnosed Plaintiff with major depressive disorder, recurrent with psychotic features, rule out schizoaffective disorder and obsessive compulsive disorder (Tr. 302–03).  Dr. Sarasua rated

Plaintiff's GAF at "50=highest for the year" (Tr. 303).[10]   As part of her overall evaluation, Dr. Sarasua also completed a "Supplemental Questionnaire" as to "Medical Assessment of Ability to do Work-Related Activities (Mental)," in which she opined that Plaintiff's abilities to follow work rules; relate to co-workers; interact with supervisors; maintain attention and concentration; understand, remember, and carry out complex or detailed instructions; behave in an emotionally stable manner; and relate predictably in social situations were "poor" (Tr. 304–05).   His abilities to use judgment; understand, remember, and carry out simple job instructions; and maintain personal appearance were "Fair" (*id.*).   Dr. Sarasua further indicated that Plaintiff had no useful ability to function in the areas of dealing with the public, dealing with work stress, functioning independently, and demonstrating reliability (*id.*).   With respect to "Other Work-Related Activities," Dr. Sarasua stated that Plaintiff was unable to maintain a schedule, be around people, or focus and concentrate secondary to psychosis (Tr. 305).

On July 23, 2004, Plaintiff underwent a consultative orthopedic examination by C.W. Koulisis, M.D. (Tr. 306–15).   In addition to his examination of Plaintiff, Dr. Koulisis indicated that he had reviewed medical records from the VA and Dr. Lucey, as well as chiropractic records from 1998 (Tr. 306).   Dr. Koulisis noted no abnormal findings on physical examination, and x-rays of Plaintiff's lumbar spine obtained at the time of the examination revealed no acute bony abnormalities (Tr. 307).   Dr. Koulisis's diagnostic impression of Plaintiff's condition was chronic low back pain with left leg complaints (neurologically intact) (Tr. 308).   He further stated that, although Plaintiff complained of chronic low back pain with left leg pain, objectively, he maintained range of motion of the lumbar spine without palpable spasm and was neurologically intact with negative tension signs (*id.*).   Dr. Koulisis also completed a report regarding Plaintiff's range of motion (Tr. 309–11).   Except for a limitation in Plaintiff's knee flexion, Dr. Koulisis noted no other range of motion limitations (*see* Tr. 310).   In conjunction with his examination of Plaintiff, Dr. Koulisis compelled a "Supplemental Questionnaire" entitled "Medical Assessment of Ability to do Work-Related Activities (Physical)," in which he provided opinions regarding Plaintiff's physical

---

[10]A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).   *See* Am. Psychiatric Ass'n, *supra*, note 8, at 32.

capacities and limitations (Tr. 312–15).  Dr. Koulisis opined that Plaintiff had no impairment in his abilities to lift and carry; sit, stand, or walk; or use his hands or feet, and he had no postural, manipulative, communicative, or environmental limitations (*id.*).

On July 19, 2005, at the request of the Social Security Administration, Plaintiff underwent a second psychological evaluation (Tr. 342–50).  Plaintiff was evaluated by Susan A. Danahy, Ph.D., and she administered the Wechsler Adult Intelligence Scale-III (WAIS-III), the Wide Range Achievement Test-III (WRAT-III), and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) (Tr. 342).  Dr. Danahy noted that Plaintiff was appropriately dressed and groomed, he looked his stated age of thirty-four, he was completely oriented, and his memory seemed intact in all spheres (Tr. 342).   Although Plaintiff reported that he sometimes heard voices, he was evasive when questioned about them and Dr. Danahy found nothing on mental status examination to suggest a thought disorder, including hallucinations or delusions (Tr. 344).  Plaintiff denied a past or current history of suicide gestures or attempts, and his affect was within normal limits (Tr. 344).  Dr. Danahy reported that Plaintiff's scores on the WAIS-III indicated that he was functioning in the low average range of intelligence with a verbal IQ of 86, a performance IQ of 89, and a full scale IQ of 87 (Tr. 345).  She noted that, with a full scale IQ of 87, Plaintiff's only limitations would be for jobs requiring a great deal of technical information, high level abstraction, or completely independent decision making but that he should be able to do most types of skilled and all kinds of semiskilled jobs (Tr. 345–46).  Plaintiff's WRAT-III scores corresponded to an eighth-grade level in reading, but only a fifth-grade level in spelling and a fourth-grade level in arithmetic (Tr. 346).  Plaintiff's reading score was consistent with his intellectual abilities, but his arithmetic score indicated that he might have a specific learning disability (*id.*).  Overall, his WRAT-III scores suggested that he had pockets of strengths and weaknesses (*id.*).  Dr. Danahy reported that Plaintiff's MMPI profile was invalid (*id.*).  Dr. Danahy's diagnostic impressions were pain disorder associated with back pain, depression, and insomnia, and rule out learning disorder NOS (*id.*).  She gave no Axis II diagnosis, but she rated Plaintiff's GAF at 55 (*id.*).[11]  Dr. Danahy concluded that Plaintiff did not seem "that

---

[11]A GAF score between 51 and 60 reflects moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning *(e.g.*, few friends, conflicts with peers or co-workers).  *See* Am. Psychiatric Ass'n, *supra*, note 8, at 32.

depressed" to her, and he seemed to function well in his sisters' households and in caring for their children (Tr. 346–47). She further stated that Plaintiff might have a specific learning disorder in the area of arithmetic, but the overall academic picture painted by the results of the WRAT-III was inconsistent with an individual who was able to obtain an AA Degree in Criminal Justice (Tr. 347). In conjunction with her evaluation of Plaintiff, Dr. Danahy completed a "Supplemental Questionnaire" as to "Medical Assessment of Ability to do Work-Related Activities (Mental)," in which she opined that Plaintiff's ability to understand, remember, and carry out detailed instructions was slightly impaired, but he had no limitation of function in any other relevant area (Tr. 348). She indicated that his full scale IQ was in the low average range and that he might have some difficulty with reading (*id.*). Otherwise, she noted that Plaintiff would have no difficulty interacting with the public, supervisors, or co-workers and could appropriately adjust to usual work pressures and changes in work-routine settings (Tr. 349). Dr. Danahy indicated that Plaintiff had no psychological impairments in the area of work supervision, co-workers, and work pressure (*id.*). She also remarked that Plaintiff's back pain should be evaluated separately (*id.*).

At the hearing before the ALJ on January 25, 2005, Sheila Gail Justice, a Vocational Expert ("VE") testified (Tr. 62–67). Ms. Justice testified that she had reviewed Plaintiff's file and listened to his testimony (Tr. 62). She classified Plaintiff is as a younger person with a high school or above education (*id.*). She noted that Plaintiff's past work is classified by the Dictionary of Occupational Titles ("DOT") as a heavy equipment mechanic — a skilled job with a medium exertional level (Tr. 63). Assuming that Plaintiff's testimony was <u>fully credible</u>, and taking into account his age, education, past work experience, and the physical limitations established by Dr. Koulisis's examination, Ms. Justice testified that Plaintiff could do his past relevant work (Tr. 63). In fact, Ms. Justice testified that Plaintiff could do a full range of work at all exertional levels (Tr. 64). "He

would be available for a wide range of any sedentary,[12] light,[13] medium,[14] heavy, or very heavy jobs that he was qualified to do" (*id.*; *see also* Tr. 67 (Ms. Justice confirmed that her opinion took into account Plaintiff's testimony)).  Next, assuming that Plaintiff's testimony was <u>fully credible</u>, and taking into account his age, education, past work experience, and the physical limitations as set out by the RFC evaluations conducted on June 14 and 16, 2003, Ms. Justice testified that Plaintiff could not return to his prior employment, but he would be able to do the full range of light work (Tr. 64; *see also* Tr. 67).  For example, Plaintiff could perform work as an electric motor assembler, a semiskilled job with a light exertional level with 72,588 jobs in the national economy and 1,015 in Florida; an electronics assembler, a semiskilled job with a light exertional level with 212,007 jobs nationally and 1,200 in Florida; and a gate guard, a semiskilled job with a light exertional level with 865,864 jobs in the national economy and 60,289 in Florida (Tr. 64–65).

　　　At the supplemental hearing on October 8, 2005, Leslie Gillespie, another VE, testified (Tr. 82–92).  Ms. Gillespie testified that she was familiar with Plaintiff's file and had observed his

---

[12]Sedentary work is defined in 20 C.F.R. § 404.1567(a) as follows:
Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

[13]Light work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

[14]Medium work is defined as:
Exerting 20 to 50 pounds of force occasionally, and/or 10 to 25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Light Work.
U.S. Department of Labor, DICTIONARY OF OCCUPATIONAL TITLES, Appx. C at IV(c) (4th ed. 1991) (hereafter "DOT").
 Heavy Work is defined as:
Exerting 50 to 100 pounds of force occasionally, and/or 25 to 50 pounds of force frequently, and/or 10 to 20 pounds of force constantly to move objects.  Physical Demand requirements are in excess of those for Medium Work.
*Id.*

testimony (Tr. 82–83).  Assuming a person of Plaintiff's age, experience, education, past work experience, and a GAF of 60, Ms. Gillespie testified that Plaintiff would have trouble with peers and coworkers (Tr. 83–84).  Ms. Gillespie testified that if such a person was physically limited as set out in Dr. Koulisis's report and had a GAF of 60, Plaintiff would have difficultly maintaining employment because of his inability to get along with coworkers (Tr. 84–85).  There would be a small percentage of jobs that he could perform with a GAF of 60 (Tr. 85).  For example, he could be a flagger, an unskilled job with a light exertional level and 74,000 jobs nationally and 5,000 in Florida, and a nut sorter, an unskilled job with a sedentary exertional level and 602,000 jobs nationally and 15,000 in Florida (*id.*).  If Plaintiff's GAF was below 60, Ms. Gillespie appears to have testified that Plaintiff would not be able to work (*see* Tr. 86–87, 90–91 (explaining that a person with a GAF of 50 would be unable to work)).[15]  Assuming the same facts, but substituting an IQ of 87, which is at the low average level, Ms. Gillespie testified that Plaintiff's ability to be placed in a job would be "extremely limited," and also taking into account his physical limitations, she said that finding employment would be "difficult to impossible" (Tr. 87–88).  Without the physical limitations, Ms. Gillespie said that a person with such a low average intelligence could work at the unskilled and very low levels of the semiskilled occupations that do not "have a lot of physical demands" (Tr. 88).  For example, Ms. Gillespie testified that such a person could be an outside deliverer, an unskilled job with a sedentary exertional level and 116,000 jobs in the national economy and 6,300 in Florida; an order caller, an unskilled sedentary position with 2.7 million jobs nationally and 395,000 in Florida; and a light shade assembler, an unskilled sedentary job with about 541,000 positions across the nation and about 22,000 in Florida (*id.*).  If Plaintiff's testimony was fully credible, Ms. Gillespie testified that he would be unable to work because of his mental and physical limitations (Tr. 89).

---

[15]The October 8, 2005 hearing transcript contains many inaudible portions, making Ms. Gillespie's testimony difficult to follow (*see, e.g.*, Tr. 86).

V.     DISCUSSION

Plaintiff raises two issues on appeal.  First, Plaintiff alleges the ALJ failed to give proper weight to his subjective complaints of pain (Doc. 8 at 10–14).  Second, Plaintiff argues that the ALJ erred by failing to give great weight to the 100 percent disability rating assigned to Plaintiff by the VA (*id.* at 8–14).

A.     Failure to Apply the Eleventh Circuit Pain Standard

Plaintiff argues that the ALJ erroneously applied the Eleventh Circuit pain standard (*see* Doc. 8 at 10).  Specifically, Plaintiff argues that the ALJ should have determined that the objective medical evidence indicated that Plaintiff was in disabling pain (*id.* at 13).  In response, the Commissioner argues that the ALJ properly applied the pain standard (*see* Doc. 9 at 3–8).  In particular, the Commissioner notes that the ALJ determined that Plaintiff's testimony was not credible and properly discounted Plaintiff's complaints of disabling pain based on reasons with substantial support in the record (*id.* at 7–8).

Pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part

standard." Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Dep't of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[16]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.

---

[16]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

"Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, supra, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In this case, Plaintiff argues that the ALJ improperly applied the Eleventh Circuit's three-part pain standard (Doc. 8 at 11–12).  Specifically, Plaintiff argues that the ALJ should have found that his underlying condition, lumbosacral spine degenerative disc disease, was sufficient objective medical evidence of a condition that would be expected produce disabling pain (see id. at 10, 12, 13).  In failing to do so, Plaintiff alleges the ALJ erred (id. at 12).  As additional support for his argument, Plaintiff cites to the VA's 100 percent disability rating[17] and disputes the ALJ's consideration of "unrelated, conflicting remarks [Plaintiff] made at the hearing concerning his receipt of [] VA benefits and his total income" (id. at 12–13).  Finally, Plaintiff states that his testimony about his daily activities is compatible with the painful symptoms he has alleged (id. at 13).  Although it is not clear, Plaintiff appears to argue that his false testimony about his income and any contradictory testimony concerning his daily activities and his alleged disabling pain are "irrelevant since degenerative disc disease is an objectively determined medical condition of such a severity that it can reasonably be expected to cause the alleged pain, especially when there is nerve root compression" (id. at 13–14).

Initially, the court notes that the ALJ specifically referred to and applied 20 C.F.R. § 404.1529 in addressing Plaintiff's subjective complaints (Tr. 25).  The Eleventh Circuit has approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529 because that regulation "contains the same language regarding the subjective pain testimony that this

---

[17]The VA's disability rating will be discussed extensively infra in Part V(B).

court interpreted when initially establishing its three-part standard." Wilson, 284 F.3d at 1226. Moreover, if the ALJ's findings of fact "leave no doubt as to the appropriate result" under the standard, the fact that the ALJ does not explicitly refer to the standard is of no consequence. *See* Landry v. Heckler, 782 F.2d 1551, 1553–54 (11th Cir. 1986).  Here, as in Landry, the ALJ's findings of fact leave no doubt as to the appropriate result under the Eleventh Circuit standard.

First, the ALJ found evidence of an underlying medical condition; namely, the ALJ acknowledged that Plaintiff had the severe impairment of "pain disorder associated with back pain" (Tr. 18).  Then, the ALJ explained that the objective medical evidence did not establish the existence of a medical condition that could be expected to cause significant work-related limitations (Tr. 23). The ALJ found that the VA clinic treatment notes reflect that Plaintiff was diagnosed with low back pain/chronic back pain, but "there is no objective medical evidence to establish a continuous disorder of such severity as to produce disabling pain" (*id.*).  The ALJ also found that "physical examinations have failed to document persistent[18] clinical findings of loss of range of motion, muscle weakness, muscle atrophy, muscle spasm, or sensory or motor disruption" (*id.*) (emphasis added).  In support of this finding, the ALJ cited to an August 2002 examination of Plaintiff which, although it revealed spine tenderness and a positive bilateral straight leg raise, it also revealed normal muscle strength, no motor or sensory defects, and no muscle spasms (*see id.*; *see also* Tr. 266–67 (documenting normal reflexes and muscle strength with no sensory or motor deficits)).  The ALJ further noted that a follow-up examination in January 2003 showed only paravertebral tenderness (*see* Tr. 23; *see also* Tr. 264 (noting stiff gait and paravertebral tenderness)). Additionally, the ALJ cited to Dr. Lucey's evaluations of Plaintiff in January and May 2003, acknowledging that Plaintiff had diminished range of movement of the thoracolumbar spine, but also noting that the diminished range was associated with Plaintiff's subjective discomfort (*see* Tr. 23; *see also* Tr. 246); that in January 2003 Dr. Lucey reported no abnormal findings on physical examination, including normal gait, no evidence of weakness, and effective transferring from sitting

---

[18]As noted *infra*, the ALJ acknowledged that some contrary findings were made; the ALJ's point, however, was that there were not persistent findings from physical examinations to support a conclusion that Plaintiff's "impairments entailed significant work-related limitations for a continuos period of 12 months during the relevant period under consideration" (Tr. 23).

to standing (Tr. 23, 247); and, that Plaintiff came to the examination with a cane, but Dr. Lucey concluded that it was not necessary for ambulation (Tr. 24, 247).  Further, the ALJ explained that on May 9, 2003, Dr. Singh stated that Plaintiff's chronic back pain was controlled (*see* Tr. 23; *see also* Tr. 258 (Plaintiff reported that his pain level was an eight out of ten, but Dr. Singh noted that his chronic back pain was controlled and continued Plaintiff on his medications)).  Next, the ALJ found that Plaintiff's pain was reported as a five out of ten in March 2004, and Dr. Molstad noted that his gait and motor examination were normal (*see* Tr. 23; *see also* Tr. 336–38 (Dr. Molstad's records)).  The ALJ then noted that in July 2004, Dr. Koulisis found no palpable muscle spasm in his thoracolumbar spine, normal motor function, no sensory defects, and a negative straight leg raise test (*see* Tr. 23; *see also* Tr. 307–11 (Dr. Koulisis's records explaining that x-rays showed no acute bony abnormalities; physical examination revealed normal range of motion and no impairments in Plaintiff's ability to lift, carry, sit, stand, walk, use hands or feet; and no postural, manipulative, communicative, or environmental limitations)).  Furthermore, the ALJ noted that x-rays in January 2003 and July 2004 were normal and concluded that there is no other objective medical evidence indicating that Plaintiff suffered from any severe acute or chronic disorder such as, among others, lumbar degenerative disc disease (Tr. 24; *see* Tr. 261 (noting that an x-ray in January 2003 was normal); Tr. 307 (Dr. Koulisis's records from July 2004 indicating that x-rays of Plaintiff's lumbar spine obtained revealed no acute bony abnormalities)).

The ALJ also found that Plaintiff's pain had been effectively managed conservatively with medication, and he had never been hospitalized for his condition (Tr. 24).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)).  The ALJ's findings are well supported by the record.  First, the record confirms that Plaintiff was never hospitalized for his condition.  Second, the record shows that Plaintiff has been treated conservatively with medication and therapy.  For example, in 1998 Dr. Bourassa treated Plaintiff's back pain with chiropractic manipulation and electrical muscle stimulation therapy resulting in maximum medical improvement, 0 percent impairment, and no residual disability (*see* Tr. 234–37).  When Plaintiff was next seen, in August 2002, a VA NP diagnosed Plaintiff with low back pain and prescribed a non-steroidal anti-inflammatory medication

and a muscle relaxer (*see* Tr. 266–67).  In January 2003, Plaintiff was treated by a VA doctor for back pain and depression (*see* Tr. 262–65).  He was prescribed Lortab and an antidepressant (*see* Tr. 264; *see also* Tr. 261, 258 (noting only medication refills)).  In January 2004, Plaintiff advised NP Surrett that he felt he was doing much better and did not want to come to the mental health clinic anymore (Tr. 340).  In February 2004, Plaintiff was prescribed a TENS unit for back pain (Tr. 340). In March 2004, Dr. Molstad diagnosed Plaintiff with hypertension, depression, mood disorder due to a general medical condition, and chronic back pain (Tr. 337).  Plaintiff was prescribed various medications (Tr. 338; *see also* Tr. 334 (Plaintiff continued on medications)).  On June 4, 2004, Dr. Lancaster, a psychiatrist, treated Plaintiff after Plaintiff's brother passed way (*see* Tr. 331–32).  She prescribed Ambien to help Plaintiff sleep and discussed death and dying with him (*see id.*).  Dr. Lancaster also suggested group therapy, but Plaintiff declined treatment (Tr. 331).  As provided in the Social Security Regulations, 20 C.F.R. § 404.1530, "[i]n order to get benefits, [an individual] must follow treatment prescribed by [his] physician if this treatment can restore [his] ability to work."  *See also* Watson v. Heckler, 738 F.2d 1169, 1173 (11th Cir. 1984) (in addition to the objective medical evidence it is proper for the ALJ to consider Plaintiff's failure to seek treatment). In September 2004, Dr. Brock at the VA mental health clinic diagnosed Plaintiff with "Major Depression r/o uncomplicated bereavement" (Tr. 325).  Plaintiff was given a trial of Trazedone for sleep augmentation and asked to return for follow-up in three weeks (*id.*).  The record does not reflect that Plaintiff returned.

The ALJ also found no objective medical evidence to support Plaintiff's claim of liver failure (Tr. 24).  Specifically, the ALJ noted that laboratory tests showed a negative test for hepatitis and only slightly decreased liver functioning (Tr. 25).  In addition, the ALJ noted that Plaintiff was never diagnosed with liver dysfunction and never received treatment for any liver aliment (*id.*).  Again, the ALJ's findings are supported by the record.  For example, liver function testing at the VA clinic in September and November 2003 revealed some evidence of decreased liver functioning (*see* Tr. 341), but no other medical evidence relating to Plaintiff's liver is contained in the record.

Next, after reviewing the record, the ALJ found that no treating or examining physician concluded that Plaintiff was physically disabled (Tr. 24).  The ALJ's conclusion is supported by the record.  Plaintiff was first treated by Dr. Bourassa, who released Plaintiff from treatment with 0

percent impairment.  Chiropractic records reveal that Plaintiff's symptoms got better with treatment, albeit slowly.  Additionally, after examining Plaintiff on July 23, 2004, Dr. Koulisis opined that he had no impairment in his abilities to use his hands and feet, lift, carry, sit, stand, or walk, and he had no postural, manipulative, communicative, or environmental limitations (Tr. 312–15).  Similarly, Plaintiff was examined by Dr. Lucey on two occasions.  Although his second examination of Plaintiff revealed low back pain and decreased range of motion as compared to his first examination, the rest of Plaintiff's examination was essentially normal (*see* Tr. 270).  Moreover, Dr. Lucey did not opine that Plaintiff was incapable of work, and he was unable to assess the severity of Plaintiff's underlying disc disease without the benefit of an MRI (*see* Tr. 271).  Importantly, Dr. Lucey noted that Plaintiff carried a cane even though it was not necessary for ambulation (Tr. 247).  Next, as noted by the ALJ, no VA physician concluded that Plaintiff was physically disabled or limited to any degree (Tr. 24).  Indeed, Dr. Singh noted that Plaintiff's back pain was well controlled, and other VA physicians provided only conservative treatment.  Finally, although the agency physicians did not examine Plaintiff, their RFC assessments from June 14 and 16, 2003, are compatible with the ALJ's findings regarding Plaintiff's physical abilities (*see* Tr. 249–56) (unknown agency physician's opinion); Tr. 272–79 (Dr. Holifield's opinion).[19]

In further analyzing Plaintiff's credibility, the ALJ noted that Plaintiff had not been forthright about his receipt of VA benefits (Tr. 25).  This finding is clearly supported in the record.  On January 25, 2005, at a hearing before the ALJ, Plaintiff testified that he had not received <u>any</u> income since July 2002 (Tr. 59) (emphasis added).  He said that he was supporting himself by watching his sisters' children (*id.*).  Plaintiff further explained that his sisters were paying for his room and board and gave him spending money (*id.*).  Then, on October 8, 2005, at a supplemental before the ALJ, Plaintiff testified that he was receiving income from the VA and had been since October 2003 (Tr. 73–74).  When the ALJ questioned Plaintiff about the discrepancy in his testimony, Plaintiff testified that he said he had no income during the January 25, 2005 hearing because the money that the VA

---

[19]The ALJ also considered Plaintiff's subjective complaints of mental impairment (*see* Tr. 19, 20–23, 26–29). Plaintiff, however, has not asserted that the ALJ erred with respect to consideration of his subjective complaints of mental impairment (*see* Doc. 8 at 12–13 (discussing Plaintiff's mental treatment in relation to his subjective complaints only as it relates to the VA's 100 percent disability determination)).

was sending him was not "physically" going to him, but rather was going to his children — even though Plaintiff acknowledged that he received $2,514.00 a month and it was being directly deposited into his account (*id.*).  Plaintiff's explanation is specious.  Plaintiff is educated and clearly understands the meaning of the word "income"; it is obvious that he deliberately chose to mislead the ALJ.

Furthermore, the ALJ found that Plaintiff's activities of daily living are inconsistent with his allegations of disabling pain (Tr. 25).  The ALJ noted Plaintiff's testimony concerning his ability to prepare his own meals and care for his sisters' children (*id.*).  The ALJ's findings are again well supported by substantial evidence in the record.  For example, Plaintiff testified on January 25, 2005 that he still drives but has to stop and sit "for awhile, long time" when parking (Tr. 42, 60 (Plaintiff testified that he drove to the January 25, 2005 hearing, but he did not mention stopping and sitting when he parked)).  He is able to care for his own personal needs, such as bathing and dressing (*id.*). Plaintiff also testified that for a period of time he was directed by the VA to exercise each day, but now states he can only walk around the block once a week (*see* Tr. 49–50).  On a good day, Plaintiff testified that he can clean up around the house and do chores (Tr. 50).  When the weather is warmer, Plaintiff has only about two bad days per week (*id.*).  He also said that he supports himself by watching his sisters' children, who are seven, eight, ten, and eleven (Tr. 59).  Plaintiff also testified that he has a nineteen-month-old baby from another relationship that he cares for daily (Tr. 44).  He testified that he does all of the "childcare and washing and all that good stuff" without any support, financial or otherwise, from the infant's mother (*id.*).  Although Plaintiff's descriptions of his daily activities show some limitations, the ALJ is not required to believe all of a claimant's assertions concerning his activities.  *See* Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996).  Moreover, the ALJ may properly consider daily activities when evaluating subjective complaints of disabling pain and other symptoms.  *See* Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).

In conclusion, the ALJ determined that Plaintiff's subjective complaints were not fully credible and that his symptoms were not as limiting as he alleged (Tr. 25–26).  In reaching this determination, the ALJ articulated his reasons for discounting Plaintiff's subjective complaints and

allegations of disabling pain, and the ALJ's reasons have substantial support in the record.  Thus, the ALJ did not err.  *See* Foote, 67 F.3d at 1562; MacGregor, 786 F.2d at 1054.

      B.      Failure to Give Great Weight to the VA's Disability Rating

      Plaintiff argues that the ALJ erred by failing to give great weight to the VA's 100 percent disability rating (Doc. 8 at 8–10).  Although Plaintiff acknowledges that the VA rating is not binding on the Social Security Administration, he argues that the ALJ did not articulate sufficient reasons for failing to give the rating great weight (*id.* at 9).  In response, the Commissioner points out that the ALJ considered the VA's determination of 100 percent disability and, after noting that the opinion was not supported by the record, did not assign the opinion great weight (Doc. 9 at 8–9).  Specifically, the Commissioner explained that the ALJ did not assign the VA disability rating great weight because the documentary evidence supporting the VA's conclusion was not contained in the record (*id.* at 9).

      It is clear in the Eleventh Circuit that a disability rating by the VA, although not binding on the Commissioner, is entitled to great weight and that it is error for the Commissioner to ignore it. Bloodsworth v. Heckler, 703 F.2d 1233, 1241 (11th Cir. 1983) (holding that "findings of disability by another agency, although not binding on the [Commissioner], are entitled to great weight."); Rodriguez v. Schweiker, 640 F.2d 682, 686 (5th Cir. Unit A, March 25, 1981)[20] (holding that "a VA rating is certainly not binding on the [Commissioner], but it is evidence that should be considered and is entitled to great weight . . . and [in this case] should have been more closely scrutinized."); DePaepe v. Richardson, 464 F.2d 92, 101 (5th Cir. 1972); Hogard v. Sullivan, 733 F. Supp. 1465, 1468–69 (M.D. Fla. 1990); *see also* Goodley v. Harris, 608 F.2d 234, 236–37 (5th Cir. 1979) (observing that an ALJ may not arbitrarily ignore uncontroverted medical testimony and suggesting that where there is medical evidence of disability, the government cannot deny disability benefits without some medical opinion that claimant is in fact capable of gainful employment).

---

[20]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

In this case, the ALJ did not ignore the VA's 100 percent disability rating (Tr. 24).[21]  The ALJ noted that the VA award letter specifically referenced a September 25, 2003 VA spine exam and MRI identifying a disc protrusion at the L5-S1 level with right nerve root compression (*id.*). The VA award letter also referenced a VA mental disorder exam dated September 22, 2003 diagnosing Plaintiff with a mood disorder secondary to degenerative disc disease and determining Plaintiff's GAF as 35 (*id.*).  However, the ALJ found that, "[t]he documentary evidence of record contains no record or reports of the [] exams that were purportedly performed in September[] 2003 and subsequent VA records from 2004 do not reference any such reports or examinations" (*id.*). Thus, the ALJ found that in "the absence of documentary medical reports to support the conclusions stated in the VA award letter, the [ALJ] cannot assign [these] conclusions any controlling evidentiary weight" (*id.*).   The ALJ also noted that the VA letter did not note any functional limitations (*id.*).

The ALJ's conclusions and findings are supported the record.  By Plaintiff's own admission, the medical records cited in the VA award letter assigning him a 40 and a 100 percent disability rating are not contained in the record (*see* Tr. 52, 54).  Furthermore, as the ALJ noted (*see* Tr. 24), Plaintiff's subsequent visits to VA doctors do not cite to the records referenced in the VA award letter (*see* Tr. 340–41, 336–39, 337, 327–31).  For example, in March 2004 Dr. Molstad, a VA doctor, examined Plaintiff noting no abnormal findings (Tr. 337).  If the MRI (and other medical evidence) upon which the VA based its decision indeed exists, Plaintiff has offered no explanation as to why he failed to supply these records.  The record clearly demonstrates that Plaintiff knew the evidence was not in the record at his <u>first</u> hearing before the ALJ, as his attorney specifically acknowledged that the MRI report was missing (*see* Tr. 52).  The ALJ then stated, "see if you can get a report on that," to which Plaintiff's attorney responded, "yes sir" (Tr. 52).  However, the report was never submitted, even though Plaintiff had a supplemental hearing before the ALJ approximately eight months later.  Thus, the ALJ was within his right to question the VA's disability ratings, as they were based in large part on records that are not in the file.  Moreover, the disability

_____

[21]Although Plaintiff refers generally to a "100 % disability rating," the record reflects that the 100 % disability rating was assigned just to Plaintiff's mood disorder; Plaintiff's disc disease was assigned only a 40 % disability rating (*see* Tr. 228).

ratings are inconsistent with the record.  For example, the VA award letter indicated that Plaintiff had a GAF of 35 (Tr. 229).  However, as the ALJ noted in other portions of his decision (*see, e.g.*, 29–31), other mental health professionals who examined Plaintiff found that he had much higher GAF and at least a low average IQ (*see, e.g.*, Tr. 346 (GAF of 55); Tr. 341 (GAF of 60); Tr. 303 (GAF of 50); Tr. 345–46 (full scale IQ of 87, representing low average intelligence)).  Moreover, as the ALJ was aware (*see* Tr. 21–22), Dr. Danahy found that Plaintiff could read at an eighth-grade level, but could only spell at a fifth-grade level and do arithmetic at a fourth-grade level — abilities seemingly incompatible with a GAF of 35 (Tr. 346).  Finally, Plaintiff's own allegations, as the ALJ again noted, are not consistent with a GAF score of 35 (*see* Tr. 27–28 (noting Plaintiff's statements that he is able to care for his sisters' young children and his own infant child, including preparing and cooking meals and doing simple household chores)). *See* Macia, 829 F.2d at 1012 (the ALJ may consider Plaintiff's description of his daily activities when evaluating his subjective complaints); 20 C.F.R. § 404.1529(c)(3)(i).

Thus, the ALJ did not fail to properly consider the VA's disability ratings because he articulated substantial reasons, supported by the record, for not according great weight to them.  *See* Bloodsworth, 703 F.2d at 1241; Rodriguez, 640 F.2d at 686.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Michael J. Astrue is substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED**:  That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this <u>16th</u> day of August 2007.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**